Please rise. This court is now in session. Please be seated. Clerk, will you call the next case, please? Case number 3-15-0206, People of the State of Illinois, a plea by Gary Gennadyk v. James Treece, appellant by Jonathan Krieger. Mr. Krieger. Good afternoon, Your Honors. Again, my name is Jonathan Krieger. I'm here on behalf of James Treece. The issue today is whether biological evidence from James Treece's trial decades ago should finally be tested. At this point, there are only two issues to be decided. First, whether testing has the potential to advance Mr. Treece's claim of innocence, and second, whether res judicata can be equitably applied to bar Mr. Treece's claim. I'll address material relevance first. The state has conceded that my client has set out a prima facie case, that identity was an issue at trial, and that he has made sufficient affirmance as to chain of custody. On the merits end, the sole issue is whether, under Section 116-3, testing has the potential to produce evidence materially relevant to my client's claim of actual innocence. As this Court has held before, this is a low standard. It's one that is more akin to discovery or admissibility than a more rigorous standard of proof. My client need not show that testing could potentially exonerate him completely, but only that it significantly advance his claim. Now, this low standard is consistent with Section 116-3 and its remedy. The only remedy for the statute is testing. It's not a reversal of convictions. It's not a new trial. It's not a new sentencing hearing. And this limited remedy is reflected in the limited showing that's required to gain testing. Now, given this context, courts have found broadly that testing could be materially relevant when it would show another offender committed the offense. This is the case even if the prosecution's case is strong or overwhelming. Now, applying the black-letter law to these facts, McCarty's finding that the testing here has the potential to produce materially relevant evidence. The trial in this case boiled down to two accounts. William Braid testified that my client abducted the victim, Jessica Hosick, from her home. Mr. Braid then admitted that he attempted to have vaginal intercourse with the victim, was unsuccessful, and he forced oral sex with the victim. He then left my client alone in the room with the victim, and when he came back, my client was putting his clothes back on. Now, a vaginal swab from the autopsy showed that there was seminal material inside the victim's body, and the state argued in closing argument that my client, not Braid, was responsible for the vaginal assault on the victim. My client, for his part, testified that he played no part in the kidnapping or the assault or the eventual killing of the victim in this case. Testing both the seminal material and the hair evidence in this case has the potential to significantly advance my client's claim of actual innocence. First, with regard to the seminal material, in case after case, testing of the two liquids has been found to have the potential to produce materially relevant evidence regarding a sexual assault, same as the case here. If a result came back indicating that Braid's DNA was found in the vaginal swab, it would destroy his credibility. He claimed that he did not commit a vaginal assault on the victim, and the presence of his semen would disprove that. Similarly, if DNA testing found another person that was not Braid or my client, that would also destroy his credibility. He claimed there were only two people with the victim on that night. What if she had had sex with somebody a half hour before she was abducted? Right, and I think that's the People v. Grant case that I have moved to set additional authority addresses that concern very well, which is to say that if there was a possibility that someone else had had sex with her, that that had happened in the Grant case, and the court found that that wasn't sufficient to preclude testing. You've got a motion to cite additional authority. I don't think we've moved on that motion. Are you going to try to discuss that case before us now? I was just addressing—I'm sorry, Your Honor. Okay, well, you know, there's a proper procedure as to allowing opposing counsel opportunity to respond. Sure. I apologize. I'm sorry for that. Under, I think, a general analysis under Johnson and Shum, the fact that it's possible that there could be another scenario where an otherwise favorable result might not fully exonerate, that's not reason enough to preclude testing under Section 116-3. The question is whether it would advance the claim, and as a general matter, it would advance the claim if someone else's DNA was found on the vaginal swab. What would that do with the murder weapon evidence, like a gun? Yes, Your Honor. The murder evidence was consistent with both Braid's account and my client's account. According to my client's account, he was with Braid on the night of the crimes, but he was sick at the time, and Braid easily could have taken the gun, committed the crime to come back and put it back on him. There was no physical evidence that actually tied my client to having shot the weapon. And the DNA testing that showed that Braid's DNA was on the vaginal swab or on the underwear would not only destroy his credibility as to the criminal sexual assault, but it would also advance my client's more general claim that he was innocent of all the offenses because it would indicate that my client had not had sex with the victim on that night. And that was supposedly the motive for the abduction, and that was really the only reason that he would have felt that he needed to kill her on that night. And so in addition to destroying Mr. Braid's credibility on the one point as to sexual assault, it would also affect the convictions for the other offenses. And that's something that the Supreme Court in Johnson held. In that case, there was also a sexual assault and a murder, and the court found that an exonerating result on the DNA would also affect the murder conviction, would have the potential to affect the murder conviction. In addition to the summoning material, there was also the hair evidence. The state called a forensic scientist who testified that hair consistent with the victim was found on clothing and bedding associated with my client, and that hair consistent with my client was found on clothing associated with the victim in this case. If testing disproved those links, it would make it much less likely that the prolonged interactions that the state claimed had occurred between the victim and my client in this case had in fact occurred. And again, that would also go to all of the offenses, not just the aggravated criminal sexual assault. In its brief, the state presents this scenario where it's possible a favorable result might not prove that my client was in fact innocent. For instance, if he had had sex but had not ejaculated. In this case, we know that there was semen that was found in the victim's body. And in addition, even though there is a possibility of that scenario as a general matter, a DNA test finding Braid's DNA or another person's DNA would tend to exonerate my client with significant advances of actual innocence. As a whole, favorable results would destroy Braid's credibility and corroborate my client's account. He's thus set forth a valid claim on the merits, and if he had sought DNA testing today for the first time, it would be successful. They would have ordered testing. But it's not that simple in this case. As your honors know, my client has filed assault testing previously, and he's therefore in a worse position than if he had waited decades to have assault testing under Section 116-3, which brings me to the second issue before the court for the application of Braid's true dakata. My client has, as I said, sought testing repeatedly under Section 116-3, but that should not bar testing based on this motion. Braid's true dakata is an equitable doctrine, and applying it in this case would be profoundly unfair. Initially, Braid's true dakata is relaxed when the law changes, and since his initial ruling in this case in 1998, the legislature and the courts have repeatedly expanded the group of defendants eligible for testing under Section 116-3. And the 1988 ruling in this case was subsequently overruled by initially the Supreme Court, then the legislature, and the 1998 ruling, I think, is an important one because the other motions were dismissed, in whole or in part, based on that ruling. Now, in 1998, the circuit court rejected my client's claim because it found that a DNA testing favorable DNA result would not exonerate my client of the murder, thus applied a total vindication standard. But the Illinois Supreme Court in the Savory case found that that wasn't the rule. The question was they followed fairly strictly the language of Section 116-3. The only question is whether it would have the potential to produce materially relevant evidence, which is a lower standard. Now, and then a couple years later, the Illinois legislature amended Section 116-3 to make clear the complete exoneration was the potential to completely exonerate. The defendant was not required to gain testing. The state doesn't dispute that this was a big change in the law. It argues, however, that the initial ruling was proper. However, as I've argued in my reply, it relies on the total vindication standard that was rejected by the court in Savory, which brings me back to the equitable concern that I raised before, which is that if my client had filed a motion for testing for the first time, it would have been successful. There's no time limit under Section 116-3. There's no timeliness requirement like proof of lack of culpable negligence or cause for the cause and prejudice standard for post-conviction petitions. And it would be unfair for my client to be punished for raising testing claims previously when this is the first time he's raised a fully developed claim. In considering equities, this court should consider the reason behind Section 116-3, which is that the legislature has recognized the large number of exonerations in Illinois, including ones for people on death row, and also recognize the importance that DNA has both in implicating people in crimes and also exonerating them from crimes. In addition, Ray Stradicata should be relaxed in this case because the motions are not identical. The motion filed today is not, rather in this appeal, is not identical to his previous motions. This is the first developed request for testing that he has made. He cited cases, many of which we cited in our briefs, and he specified which exhibits he wanted testing, many of which we are requesting testing in this appeal. Mr. Onrus, do you have any more questions? I guess just with respect to DNA evidence exonerating people, nobody testified that your client sexually assaulted the victim. So how is any lack of DNA evidence going to exonerate him from shooting? Well, that's not the standard. The question is whether it had the potential to advance his claim, and there's no requirement that it have it over everything. Well, I get that part. I was just hinting at it in your last comment about exonerations. Sure, yes. I mean, it's our position that a favorable DNA result would exonerate him of all of the offenses. I'm sorry, I don't know if that addressed your question. Because it's only the statement by the codependent, right? Yes, I mean, so it's true. That he did all of these things. It's true that Bragg testified that he didn't see him commit the aggravated criminal sexual assault, yet he stands convicted of it. In an earlier collateral proceeding, my client argued that he should therefore be, since the state was conceding he hadn't committed aggravated criminal sexual assault, he should have been, his conviction for that should be reversed. The state argued in closing, clearly, that my client was responsible for the vaginal assault on the victim in this case. Because he directed the whole scene. No, the argument was not based on accountability. The state only pursued a theory of principal culpability. And so without any accountability theory out there, the only way my client could have been convicted was for having personally committed the assault. And that's what the state argued. Counsel, that's one minute. Thank you. When was that third motion filed? I believe it was in 2011 and denied in 2012. And I would point out that the state in this appeal has abandoned the basis for that, for that ruling which was based on that he hadn't proven chain of custody and identity to the extent that that would affect this court's decision in applying the equities for applying race judicata. Well, I think along with the other concerns I've raised, it indicates that some of the previous ones, some of the previous rulings were, everyone agrees were on an incorrect basis. And although that's not enough alone to consider race judicata, now that the parties have basically agreed that both the ruling for this, for the one under the motion of their appeal and the previous one had, the circuit court's rulings had no basis, it would be unfair for the court to rely, especially in the previous ruling in any way to preclude testing in this case. Thank you very much. Mr. Greenberg. And Mr. Greenberg, are you ready to respond? I'm glad you asked. I don't exactly know how to do this. I am ready to respond to that, so. If you don't mind. We're happy to take and respond. Would you like it in writing also or is this adequate? It's fine with me if you just want to argue it just as a motion. Yeah, I just thought we had a rule in motion. Yeah, I'm comfortable with that. Okay, well, it's got to be fair, that's all. I appreciate that. Thank you. May it please the court, counsel. I'm going to take and do this in reverse order from counsel. I'm going to start with Register Dikata, obviously because it's the basis, strongest basis that we have in this case, because I think it is conclusive. In this case, the defendant had a 1985 conviction. Years later, he filed a motion. Motion number one for 116.3 testing of DNA, seminal fluid, and of hair, et cetera. That original motion was dismissed without prejudice because it was conclusory. So I believe it was Judge Keeney in Will County dismissed without prejudice. So what he did is the defendant filed a motion to reconsider. In that motion to reconsider, he added a lot more substance to it, stating what he wanted tested and why he wanted tested. The reason why he wanted DNA tested of the seminal material is because the defendant said, look, if I can take and show that my DNA is not there, that means co-defendant lied, and therefore I am innocent of murder. He's making a jump from the sexual assault to innocence on the murder. Judge Keeney basically said in ruling, after he included the more specific facts, Judge Keeney, in his decision query, how would a showing sole DNA present in the victim was that of the co-defendant, how would that affect the defendant's conviction and sentence for any other crime other than aggravated criminal sexual assault? He couldn't make the leap of faith that the defendant was arguing. He can't make that connection with the fact there's no DNA. What does that show? How does that advance, materially advance, materially relevant to who pulled the trigger? It doesn't show anything. And so Judge Keeney basically saw the futility, and what he said is this DNA evidence, even if favorable to the defendant, would not refute any testimony at trial and cannot be said to be able to address which of these defendants actually shot the victim with the defendant's, truce's, father's gun. That's at Common Law Record 3C484. Judge Keeney was not saying, was not using, as counsel was trying to portray, this idea that there has to be complete exoneration. In essence, what Judge Keeney was actually doing is he was applying the statute as it has been currently interpreted. The claim, the testing, has to advance a claim of actual innocence. Defendant wants to be claimed actually innocent of murder, but this DNA evidence has nothing to do with that. It doesn't relate to that, and it's not materially relevant to or otherwise advance his claim of actual innocence with respect to his conviction for murder. So that was Judge Keeney's ruling. Then subsequently, on May 8th of 2006, the defendant filed a motion, oh, by the way, from Judge Keeney's ruling, there was no appeal. Motion number two on May 8th of 2006, the defendant reiterated his 116.3 request for forensic testing, claiming actual innocence of the aggravated criminal sexual assault when ID was crucial to issuing a conviction, which would therefore exonerate him of murder. Same exact thing that he raised in his first motion. The trial judge in his second motion struck it based on race judicata. Defendant appealed that conviction. The problem is appellate counsel in that case filed a family, saying there was nothing here upon which it could be given, apparently agreeing with the fact that the second motion was race judicata because the defendant filed exactly the same motion as his first motion that was decided adverse to the defendant, of which he took no appeal. So then motion number three was filed September 28th of 2011. In this case, however, he's making a claim of actual innocence, but his claim was this time the DNA is directed at the murder conviction. Based on co-defendant's testimony, that identified the defendant as the person who shot and killed the victim. He alleged in general language it was maturely relevant, but there was no suggestion how the DNA, once again, was relevant to the murder. In this particular case, the trial judge denied the motion for three reasons. Number one, failed to meet the chain of custody. Two, identification was not an issue. And three, since this was defendant's third motion, race judicata, which now leads us to defendant's fourth motion for DNA testing. It is now based upon two prior decisions by trial judges that race judicata precluded consideration, or precluded granting defendant's motion for DNA testing, all based on Judge Kinney's determination. So, what we have now is we have the fourth motion, where once again defendant re-alleges his claim of actual innocence, stating that the evidence would, the test would be used to obtain his wrongful conviction. At supplemental common law record C3743, he revisits all of the evidence he once tested and how that evidence created the identification issue in the case and proves his alleged innocence. At C4345, the premise of his motion, if testing identifies only the presence of co-defendant's DNA, it necessarily follows that it proves the defendant not only did not sexually assault the victim, but it also proves he did not murder the victim. Sounds familiar. It's exactly the same issue, the same arguments that were made all the way back when he first filed his motion before Judge Kinney. It's exactly the same thing. And so, case law provides that a 116, there is no limitation in 116-3 as to how many you can file, but the appellate court has determined that the res judicata can't limit that. If you've raised the same arguments, the same issues, between the same parties, arguing the same thing, looking for the same result, res judicata applies. Res judicata clearly, unequivocally applies in this case. The defendant's argument that res judicata is an equitable rule and application, that in this case it would be somehow unfair because of all the amendments to the statute. He's saying things aren't the same because of the different standards. There is no different standard. Standards are the same. The thing is this. These are the changes. In the 1998 statute, it provided that DNA testing on evidence that was secured in relation to the trial, which resulted in his or her conviction, but was not subject to the testing which is now requested, because the technology for the testing was not available at the time of trial. Remember, in 1998 and around this time, DNA all came into existence. So cases that were being presented were cases in which what? Some of the material, evidence was not tested for DNA because the evidence didn't exist. So what the court was saying is you have to make this allegation that basically I want this evidence tested that wasn't tested because the technology didn't exist for the testing. Well, that obviously has got to change at some point because somewhere down the line, what's going to happen? All of the cases are now going to be tried when DNA testing is what? Available. You can't make the allegation that the testing wasn't done because it wasn't available. It wasn't done because it wasn't done. So that provision was changed. They took out the business about the unavailability, and so now if you have a trial in 2016 and DNA or seminal material or blood or whatever was not DNA tested, you don't have to allege such testing wasn't available at the time of trial because we all know what? It is. So that provision was taken out. But what provision remains constant in all three? And that's current statutes the same way. What provision remains constant? The 1998 statute, subsection C1, the result of the testing has a scientific potential to produce new non-cumulative evidence materially relevant to the defendant's assertion of actual innocence. That provision has not changed. That is the same today as it was back in 1998. That is what Judge Kinney ruled on in 1998, and that's the reason why this case is barred by race judicata. Defendant's citation to Kinney and to this court's decision in Grant. In essence, when you look at what they ruled upon and what they decided actually supports our argument. In Grant, what was the evidence in Grant? The evidence in Grant was the defendant said, I did not commit the sexual assault. There was an untested pubic hair found in the vagina of the victim. According to defendant, I think it was the brother had said that he had had sex with the victim. But the victim said no, it was the defendant. Well, the testing of that pubic hair, would that not be materially relevant to the defendant's assertion of actual innocence of what? Of a criminal sexual assault. Because if that was not his pubic hair, it would obviously be clear that it was someone else's. Mind you, I agree, it doesn't necessarily mean that he would be found innocent. Yes, you don't have to have semen, you don't have to have pubic hair, you don't have to have the DNA. It's a question of credibility. But nonetheless, that evidence would be materially relevant to the claim of actual innocence for the sexual assault. Kynes is a little bit different. In Kynes, the reason why they use this equitable exception was because in 2002, when Kynes' original marshal was first brought, it was dismissed because of the fact that there was no allegation that there was no testing done because the DNA testing was unavailable at the time. But now, with the change in the statute, that particular testing could now be done because it wasn't linked to the fact that the testing was unavailable. And so what the court basically said is, the court said it would not be equitable, in this case, not to allow Kynes to basically take advantage of that change in the statute. And so as a result, that's the reason why they wouldn't apply registry of the conduct in that case. But in this case, we have an actual substantive ruling based on the statute, based on a proper reading and application of that statute. And then you take a look at Judge Kinney, what is presented. Simply because, and I somewhat take exception of counsel here with respect to, just because of the fact that you say, well, this testing is going to materially advance or materially relevant to something, therefore, basically no harm, no foul, what's the problem in testing? The thing is this. If you take a look at the evidence in this case, first of all, some of the blood evidence in this case that was done, there was testimony from one of the experts at that time, in 1985, that although uncertain as to whether there was a combined mixture of DNA material from the victim and the defendant, but based on the characteristics of the findings, if it had just been able to make that determination that it just came from the defendant, they would have found that the blood testing that they did was that that identified the defendant as having basically the positive death scene. So that's point number one. Point number two is the fact that, let's take a look at defendant's testimony. Defendant testified at trial. I was sick that day. I was in the bathroom vomiting. Came out, knocked on the door, Brave's there. Brave comes by. Brave basically says, according to the defendant, hey, the brave down the hallway there, I might have sex with her. According to the defendant, defendant gets sick again, goes in the bathroom and vomits. Brave knocks on the door, I'm leaving. Thank you. A couple hours later, while defendant then goes out to get medicine for being sick, defendant runs into Brave to go to Monocle's to have pizza. The next day, apparently, according to defendant, Brave tells him, basically, I know what happened. I killed her, but if you say anything, I'm going to kill you. Hence, defendant claims that's why he took off to Texas. You take a look at that and you compare and contrast that with the fact that evidence that was found, acrylic fibers from the apartment, blankets, in that apartment where the defendant lived, were found on the victim's clothing. There's no way that that acrylic fiber could have gotten on there unless that victim was in that apartment. Counselor makes the comment that Brave somehow took the gun, went in the bathroom and then somehow returned it. I asked the courts if they can search the record. There is no evidence at all that Brave ever returned to that apartment after he supposedly left while defendant was puking in the bathroom in order to be able to return that gun. There's absolutely no evidence. Add to that the fact that in this case, what would the DNA evidence show, even if Brave's DNA was found? Nothing. Brave testified at trial. Yeah, I had sex with the victim. You're going to anticipate that his DNA is going to be found. So as a result, in this case, there's absolutely nothing here that the defendant has alleged or argued that would materially be relevant to his claim of actual innocence to the murder of Jessica Ann Husson. As a result, we would ask this court to affirm the trial judge's denial of the motion. Thank you. Thank you, Mr. Krueger. First, I think a factual correction. The opposing counsel argues that the same theory was raised in the initial two motions filed by my client that a favorable result on the DNA would disprove the aggravated criminal sexual assault and thus the murders. That's not my reading of the first two motions. I think the first two motions were only directed at the aggravated criminal sexual assault. It's not the main aspect of our race judicata argument, but to the extent that the motions are not identical, they did raise different theories. With regard to the rationale for the 1998 ruling, opposing counsel argues that the same standard applies now as it did then. I respectfully disagree. Then the standard was total vindication, versus now it has the potential to significantly advance a claim. I think that's a very different one. Counsel read off part of section 116-3, but the provision goes on to say, even though the results may not completely exonerate the defendant, and that was something the legislature added after the Savory decision. So I think it is a difference, and it's a big difference, that should excuse race judicata in this case. With regard to the accrued fibers, even at the time the forensic scientist testified, all she could say is that they were consistent. This isn't very strong evidence, especially compared to DNA evidence. DNA evidence is much, much more accurate than a simple finding of consistency. It can exclude and include people at a far, far higher rate of probability. And finally, my opposing counsel argued that there was no evidence that Mr. Braid returned to the apartment. There was no fiscal evidence of that, but my client did testify at a court of proceedings, volume 6, 2100-2102, that he had hung out with Mr. Braid at the apartment a few days after the night that the victim in this case was killed. Mr. Honors, do you have any further questions? I believe so. Thank you, Mr. Kruger, and thank you both for your argument today. We will leave this matter under advisement to the defense of the witness position. We will now adjourn until 9 o'clock tomorrow morning. Good morning. Please rise. This court is adjourned until recess.